IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CRIMINAL ACTION |
| v. | : | |
| | : | NO. 11-455 |
| DAVID E. BALLARD | : | |

**SURRICK, J.**                                                    **JANUARY 5, 2012**

## MEMORANDUM

Presently before the Court is Defendant David E. Ballard's Motion to Suppress Search Warrants. (ECF No. 24.) For the following reasons, the Motion will be denied.

## I.      BACKGROUND

On August 11, 2011, a grand jury returned an Indictment charging Defendant with eight counts of mail fraud, in violation of 18 U.S.C. § 1342 (Counts One through Eight), and five counts of aggravated identify theft, in violation of 18 U.S.C. § 1028A (Counts Nine through Thirteen). (Indictment, ECF No. 9.) The Indictment charges that Defendant devised a scheme to defraud over 1,300 people and to obtain money and property by means of false and fraudulent pretenses. (*Id.*) Specifically, it is alleged that Defendant obtained personal identification for these individuals in order to open credit card or Internet payment accounts in their names, purchased various items using the accounts without the individuals' permission, and in many instances, intercepted the items after having them sent to the individuals' home or work addresses. (*Id.*) On August 25, 2011, Defendant was arraigned and entered pleas of not guilty. (Min. Entry, ECF No. 12.) Trial is currently scheduled for January 9, 2012. (Order, ECF No. 16.)

On October 31, 2011, Defendant filed a Motion to Suppress Search Warrants (Def.'s

Mot., ECF No. 24), and a Memorandum of Law in support of the Motion to Suppress (Def.'s Br.,

ECF No. 24-1). Attached as Exhibits to Defendant's Motion are three state search warrants and a

federal search warrant. (*Id.* at Exs. A-G.) Defendant seeks to suppress all of the evidence seized

as a result of the execution of these warrants. On November 16, 2011, Defendant filed a

Supplemental Motion–Suppression, which requested that the Government produce the originals

of the state search warrants at the suppression hearing. (Def.'s Supp. Mot., ECF No. 28.) On

November 17, 2011, we granted the Supplemental Motion and ordered the Government to

produce the original state search warrant documents, including applications and affidavits for

inspection by the Court at the suppression hearing. (ECF No. 29.) The Government responded

to the Motion on November 22, 2011. (Gov't Resp., ECF No. 31). On December 5, 2011, the

Government filed a Supplement to United States' Response in Opposition to Defendant David

Ballard's Motion to Suppress. (Gov't Supp. Resp., ECF No. 32.)

A suppression hearing was held on December 6, 2011. (Min. Entry, ECF No. 34.) At the

hearing, the Government presented testimony from Detectives James Sloan, Timothy Hartman

and Michael Acerenza, all of whom are assigned to the Northwest Detectives Unit of the

Philadelphia Police Department. (Dec. 6 Hr'g Tr. 6, 51, 63-64, ECF No. 34.) Detectives Sloan,

Hartman and Acerenza were all involved in the search of Safeguard Self Storage Unit 315 and

the arrest of Defendant on April 7, 2011. The Government also presented testimony from

Detective John Geliebter, who executed the Third State Search Warrant. Finally, we heard

testimony from Special Agent Mackenzie Monarko with the Federal Bureau of Investigation

("FBI"). Special Agent Monarko provided testimony about the Federal Warrant issued on

August 4, 2011 and the search conducted pursuant to the Federal Warrant on August 5, 2011.

## II. FINDINGS OF FACT

James Sloan has been a detective with the Philadelphia Police Department for thirteen years. (Dec. 6 Hr'g Tr. 6.) Detective Sloan is assigned to the Special Investigations Unit, which primarily covers shootings, robberies and burglaries. (*Id.* at 7.) Prior to becoming a detective, he was a West Philadelphia police officer for six years in the 18th District. (*Id.*) As a detective and police officer, Detective Sloan has served as an affiant for, and executed, hundreds of, search warrants. (*Id.*) Timothy Hartman has been a detective with the Philadelphia Police Department for almost six years, and prior to that, was a police officer for six years. (*Id.* at 52.) Detective Hartman investigates a variety of crimes, including retail thefts, aggravated assaults and shootings. (*Id.*) He has executed searches pursuant to approximately two to three hundred search warrants during his time as a detective. (*Id.*) Michael Acerenza has been a detective with the Philadelphia Police Department since 2004 and a police officer before that since 1996. (*Id.* at 64.) He investigates shootings, robberies and burglaries. (*Id.*) He has executed hundreds of searches pursuant to search warrants. (*Id.*) Detective John Geliebter has been a detective with the Philadelphia Police Department for thirteen years, and prior to that, was a police officer for five years. (*Id.* at 71.) Detective Geliebter has been an affiant for, and has executed searches pursuant to, several hundred warrants. (*Id.*)

Mackenzie Monarko has been a Special Agent with the FBI for five years. (*Id.* at 85.) She is currently assigned to the cybersquad but was previously assigned to the gang task force. (*Id.*) She investigates computer intrusion and Internet fraud. (*Id.*) In her years with the FBI, she has participated in the execution of approximately thirty to forty search warrants.

## A. The Burglary Investigation at Safeguard Self Storage

Detective Hartman was instructed by one of his supervisors to investigate a pattern of burglaries at the Safeguard Self Storage facility located at 6224 Germantown Avenue, Philadelphia, Pennsylvania. (*Id.* at 52-53.) All of the burglaries had been carried out in the same manner, and all involved the theft of electronics, such as televisions and gaming systems. (*Id.*) Safeguard management had recorded video surveillance showing Defendant entering and exiting the storage facility at various times in the middle of the night. (*Id.*) Defendant was seen carrying items, such as large screen television sets, on a cart throughout the storage facility but not carrying these items in and out of the facility. (*Id.* at 54.)

The Safeguard Self Storage facility is an enclosed building. (*Id.* at 17.) The top of each of the storage units is made of chicken wire. (*Id.* at 18.) The management of Safeguard Self Storage will periodically look into the units. (*Id.* at 17.) Based on Defendant's suspicious activities, they looked into Defendant's storage unit on April 5, 2011. (*Id.* at 17.) Management believed that certain items in the unit had been burglarized from other storage facility tenants. (*Id*) When management returned to Defendant's storage unit on April 7, 2011, they noticed that one of the items they observed on April 5th that they believed had been burglarized was no longer located in Defendant's unit. (*Id.* at 18.) Based on this information, Detective Sloan and Detective Hartman believed that Defendant was stealing items out of other storage units, placing them in his unit, and then subsequently moving them out of his unit. (*Id.* at 18, 53.)

## B. The First State Warrant

On April 7, 2011, Detective Sloan obtained search warrant no. 156317 (the "First State Warrant") to search storage unit 315 ("Unit 315") at the storage facility. (*Id.* at 7 & Def.'s Br.

4

Ex. B.)  Unit 315 belonged to Defendant.  (Dec. 6 Hr'g Tr. 7.)  Detective Pat Murray had been

involved in the burglary investigation at the storage facility and asked Detective Sloan to assist

him with obtaining the warrant.  (*Id.* at 8.)  Detective Murray typed up the First State Warrant.

(*Id.* at 9, 42.)  Detective Sloan read it over, had it approved by the Philadelphia District

Attorney's office, and swore it out before the magistrate judge.  (*Id.* at 9-10.)

The First State Warrant is two pages long.  (*Id.* at 9.)  The first page is the warrant, and

the second page is a form 75-51, also known as the "continuation of probable cause."  (*Id.*)  Form

75-51 is used when there is not enough space on the warrant to describe all of the facts and

circumstances establishing probable cause.  (*Id.*)  Located within the probable cause section of

the First State Warrant is a notation reading "see 75-51."  (*Id.* & Def.'s Br. Ex. B.)  The First

State Warrant was based on the following facts and circumstances, as described in the

continuation of probable cause:

- On May 31, 2011, Defendant entered the Safeguard Storage facility at approximately 7:35 p.m. and left the facility at 6:15 a.m. the following morning.
- On April 2, 2011, one of the tenants at the storage facility complained that her storage unit was burglarized and two flat screen TV's were taken.
- On April 2, 2011, another tenant reported that her unit was burglarized.  The items stolen included a PlayStation 3 game system, a Nintendo Wii game system, an Xbox game system, and a flat screen TV.
- Based on what they believed to be suspicious activity, Safeguard Self Storage management looked inside Defendant's storage unit on May 5, 2011.  Management observed a flat screen TV, a PlayStation 3 game system, a Nintendo Wii game system, and an Xbox 360 gaming system.
- Video footage shows Defendant entering the storage facility on April 5, 2011 at 6:17 a.m. empty-handed and leaving at 9:53 a.m. empty-handed.
- On April 6, 2011, Safeguard Self Storage management suspended the access code for Defendant.  That day, a third tenant reported that his unit was burglarized and a Skepter flat screen TV was taken.
- On April 7, 2011, Safeguard Self Storage management again looked into Defendant's unit and observed a second flat screen TV that was not present on April 5, 2011.  Management also noticed that the Xbox 360 gaming system was missing.

(Def.'s Br. Ex. A.)

The First State Warrant identifies the following items to be searched for and seized: "[Two] 42" Plasma Tv's, Playstation 3 game system, x-box game system, Nintendo games system, 1 Scepter 37" flat screen TV, and any other items of evidentiary value." (*Id.* at Ex. B; Dec. 6 Hr'g Tr. 10.)[1] The detectives understood the phrase "any other items of evidentiary value" to mean evidence relating to the burglary investigation, including things that typically accompany the electronic items listed in the warrant, such as cords, plugs, remote controls, games and paperwork. (*Id.* at 10, 54, 65-66.) Detective Sloan understood the phrase "any other items of evidentiary value" to mean "other items in reference to the . . . burglaries," such as "tv cords, remotes, any paperwork for the items." (*Id.* at 10.)[2]

Detective Hartman understood the phrase to mean that he could search for "any evidence pertinent to the investigation of the burglaries." (*Id.* at 54.) He thought it justified the search of other missing items as a result of the burglary investigation, even though those items were not listed in the warrant. (*Id.*) Detective Acerenza understood the phrase to mean that he could search for any items that "pertain to the burglaries," including the electronics reported stolen, the game systems, TVs and "items that also may go along with those items such as plugs to the game systems, the controllers and games." (*Id.* at 66.)

_____

[1] The games used for the Xbox 360 system are the same shape and size as computer CDs. (Dec 6 Hr'g Tr. 15.)

[2] During cross-examination, Detective Sloan stated that the phrase permitted him to search for fingerprints, DNA and hair. (*Id.* at 44.) Sloan went on to testify that the warrant was not limitless because he was only permitted to search for items in reference to the burglary. (*Id.*) Fingerprints, DNA and hair were not searched for or seized during the search of Unit 315.

**C.  The Search of Unit 315 and Arrest of Defendant**

At approximately 7:30 p.m. on April 7, 2011, Detectives Sloan, Hartman and Acerenza arrived at the Safeguard Self Storage facility to execute the First State Warrant. (*Id.* at 12)  At the time, the detectives had not been able to locate Defendant and did not have an address for him. (*Id.*)  The detectives entered Unit 315 and took photographs of the storage unit. (*Id.* at 13.)  The unit was filled with boxes and other items, including two television sets covered in linens. (*Id.*)  There were so many items in the storage unit that the detectives had to remove some of the items and place them in the hallway in order to "open the space up." (*Id.* at 16.)  During the search, the detectives were looking for the electronic items listed in the warrant, as well as games, remote controls, cables or paperwork for those listed items. (*Id.*)[3]  The detectives were also looking for items that might have provided information on Defendant's whereabouts. (*Id.* at 22.)  Boxes and containers were opened and looked through in order to search for these items. (*Id.*)  The entire storage unit was searched. (*Id.* at 45.)

The detectives seized two television sets from Defendant's storage unit. (*Id.* at 18.)  These TVs were later identified by other tenants as having been stolen from their storage units. (*Id.*)

Also seized were nine spiral-bound notebooks. (*Id.* at 19.)[4]  The detectives opened up the

---

[3] Detective Hartman was also looking for watches and digital cameras because he understood these items had also been stolen from units at the Safeguard Self Storage facility. (*Id.* at 55.)  Defendant has not specifically contested the seizure of watches and digital cameras.  The Government did not seek to introduce such items into evidence at the suppression hearing.

[4] Spiral-bound notebooks were seized both from Defendant's storage unit and from Defendant when he was arrested.  At the suppression hearing, the detectives were unable to

notebooks during the course of the search. (*Id.* at 20.) Detective Sloan testified that he was looking to see if the notebooks contained information about the burglarized items, including from whom they were stolen or to whom they may have been subsequently sold. (*Id.*) In fact, one of the notebooks contained contact information for a buyer of equipment stolen from another tenant at the storage facility. The detectives were able to locate the buyer, who confirmed that the equipment was purchased from Defendant. (*Id.* at 20.) The equipment was ultimately returned to its rightful owner. (*Id.* at 21.) Detective Sloan also testified that he searched through the notebooks looking for addresses for the Defendant so that they could locate him. (*Id.* at 34.)

The detectives seized seven Pennsylvania driver's licenses and one identification card. (*Id.* at 21-22.) The identification card and the licenses were in Defendant's name; however, each listed a different address. (*Id.*) Detective Sloan testified that he seized these cards in an attempt to locate Defendant and thought it was "odd" that there were so many different addresses listed on the cards. (*Id.*)

During the course of the search, the detectives searched inside five shoe boxes looking for stolen items. (*Id.* at 22, 23, 53, 56.)[5] When the boxes were opened, the detectives discovered stacks of credit reports in various individuals' names. (*Id.* at 24.) Detective Sloan testified that upon opening the boxes, he knew immediately that he was seeing credit reports for individuals other than Defendant. (*Id.*) Detective Hartman testified that upon seeing them, he immediately thought of identity theft. (*Id.* at 56.) Credit reports were also found in a milk crate located inside

---

determine which of the notebooks were seized from Unit 315 and which were seized from Defendant. (*Id.*)

[5] The boxes were boot boxes and were estimated to be approximately 18 inches by 12 inches in size. (*Id.* at 25.)

Unit 315.  (*Id.* at 32.)  Detective Sloan saw a small Burberry box inside the milk crate and lifted the box out of the crate in order to search it for stolen equipment.  (*Id.* at 31.)  Upon seizing the box, Detective Sloan noticed there were stacks of credit reports inside of the milk crate.  (*Id.*)

The small Burberry box contained driver's licenses, Social Security cards and credit cards for various individuals other than Defendant.  (*Id.* at 27-28.)  The detectives opened the box looking for any item of evidentiary value, including a video game that they believed could have fit in the box.  (*Id.* at 27.)  Detective Sloan testified that upon seeing the identification cards, he thought "immediately, [Defendant] is not supposed to have them."  (*Id.* at 28.)  An accordion file was also seized.  Detective Sloan testified that he opened the accordion file to search for the gaming CDs and other paperwork that might assist them in locating stolen items.  (*Id.* at 31.)

The Detectives searched through and seized five folders during the search of Unit 315.  (*Id.* at 32.)  Four of the folders had the name "Brennan and Associates Accounting" on the front.  The fifth folder was from "Pennsylvania Career Link."  (*Id.*)  Inside each of the folders were bank identifiers, Social Security numbers, addresses, checking account information, a birth certificate, a Social Security card, a credit report, check stubs and W-2's, all in multiple people's names.  (*Id.*)  The detectives searched through and seized a priority mail envelope addressed to Brennan and Associates.  (*Id.*)  Inside the mail envelope was personal identifying information for various individuals not Defendant, including birth dates, addresses, zip codes and spouses' names.  (*Id.*)  Detective Sloan testified that he searched the folders and mail envelope in an attempt to locate an address for Defendant.  (*Id.*)

The detectives also seized a box of checks not belonging to Defendant.  (*Id.* at 29.)  The detectives observed the check bearer's name on the outside of the box and opened the box.  (*Id.*)

Detective Sloan testified that he opened and seized the box because Defendant had somebody else's checks and "he's not supposed to have [them]." (*Id.*) A blank check in the name of Mount Airy Presbyterian Church and a blank Bank of America check were also seized. (*Id.* at 34-35.)

Other items seized included a piece of paper containing names and personal identifying information for different individuals, (*id.* at 30), Defendant's storage agreement for Unit 315 (*id.*), Defendant's passport (*id.* at 35), and Defendant's voter registration card (*id.*). Also seized were an Apple Time Capsule hard drive, two additional external hard drives, a thumb drive and two flash drive adapters, all of which are devices used to store computer data. (*Id.* at 38.)

All of the items seized were found in different locations inside of the storage unit. (*Id.* at 35.) With regard to the paperwork, including the notebooks and the credit reports, the detectives did not look through each page individually during the search, but rather waited to search through these items in greater detail when arriving back at the District. (*Id.* at 47.)

Defendant arrived at the storage facility while the detectives were executing the search warrant. (*Id.*) He arrived towards the end of the detective's search. (*Id.* at 45.) Defendant was arrested. (*Id.* at 19.)[6] When Defendant was detained, he had on his person a leather shoulder bag containing an Apple MacBook Pro laptop computer, an iPod Touch and spiral-bound notebooks. (*Id.* at 19, 37.)[7] Defendant also had on him a cell phone and a key to his storage locker. (*Id.* at

---

[6] At the time of Defendant's arrest, the detectives were aware that Defendant had an outstanding bench warrant for his failure to appear. (*Id.* at 37, 50.) After Defendant's arrest, the detectives later learned that the bench warrant related to a theft charge. (*Id.* at 51.)

[7] The shoulder bag introduced at the suppression hearing was not the leather shoulder bag that Defendant was carrying at the time of his arrest. (*See* Dec. 6 Hr'g Tr. 38 (Detective Sloan testifying that "[Defendant] has two [shoulder bags] – there was one that was in his locker, and there was one that he had on him" and stating that the one at the hearing was not the one he was carrying when arrested by the detectives).)

37.)  The detectives seized these items pursuant to a search incident to arrest.  (*Id.*)

Following the search on April 7, 2011, Unit 315 was locked and remained locked until the FBI conducted its search of the unit on August 5, 2011.  (Def.'s Br. Ex. E.)  Defendant has been incarcerated since his arrest as a result of burglary charges lodged against him in the Philadelphia County Court of Common Pleas.  (*Id.*)

### D.     The Second State Warrant

On April 9, 2011, Detectives Sloan and Geliebter obtained search warrant no. 156320 (the "Second State Warrant") to search some of the electronic equipment seized during the search of Unit 315.  (Dec. 6 Hr'g Tr. 40; Def.'s Br. Exs. C-D.)  The Second State Warrant authorized a search of the Apple MacBook laptop, Apple iPod, the two external hard drives, the Apple hard drive and the Motorola cell phone.  (Def.'s Br. Exs. C-D.)  In the probable cause section of the warrant, it reads "see attached 75-51." Form 75-51 is the continuation of probable cause incorporated into the warrant, sworn by Detective Geliebter.  (*Id.* at Ex. C.)  The continuation of probable cause explains, in relevant part, that during the search of Unit 315, which was conducted on April 7, 2011 pursuant to a search warrant, detectives recovered "numerous items including over 500 separate credit report printouts containing the personal info . . . of individuals other than [Defendant]."  (*Id.*)  The continuation of probable cause further explains that an examination of the items listed in the warrant is being sought "in order to establish ownership of the items and determine if any identity theft information exists on them."  (*Id.*)  The items listed in the Second State Warrant were subsequently searched.  (Dec. 6 Hr'g Tr. 40.)

The search of the items subject to the Second State Warrant produced personal information for over 1,000 persons other than Defendant.  (Def.'s Br. Ex. E.)  Further

investigation revealed that numerous other electronic devices, including computers, iPods and gaming systems, were ordered fraudulently using the information found on the devices listed in the Second State Warrant. (*Id.*)

### E. The Third State Warrant

On April 28, 2011, Detective Geliebter obtained search warrant no. 154906 (the "Third State Warrant"), which was directed towards the Apple, Inc. (Def's Br. Ex. F.) The continuation of probable cause, form 75-51, which was incorporated into the warrant by reference, stated that it sought a warrant "to obtain information (including but not limited to name, email address, IP address used, method of payment) regarding the purchase of" the Apple MacBook and ipod. (*Id.* at Ex. E.)[8]

### F. FBI Involvement and the Federal Warrant

The FBI became involved in the identify theft investigation of Defendant around May 2011 at the request of the Northwest Detectives Unit of the Philadelphia Police Department. (Dec. 6 Hr'g Tr. 86.) The detective unit informed the FBI of the search conducted on Unit 315 and that many items recovered during the search appeared to relate to identity theft. (*Id.*) The

---

[8] There is a dispute concerning the date on which the Third State Warrant was executed. Defendant contends that the continuation of probable cause accompanying the Third State Warrant is dated April 8, 2011 but that it is based on information seized pursuant to a warrant issued on April 9, 2011. Detective Geliebter explained that this was a clerical error. (*See* Dec. 6 Hr'g Tr. 77 (explaining that the date from the Second State Warrant's form 75-51 was inadvertently copied into the Third State Warrant's 75-51).) Based on our a review of the original Third State Warrant and based on the testimony of Detective Geliebter, we are satisfied that the Third State Warrant, including the accompanying continuation of probable cause, was prepared and issued on April 28, 2011.

FBI ultimately decided to adopt the case.[9]

Special Agent Monarko swore out a Federal complaint on July 13, 2011, charging Defendant with identity theft and other crimes. (*Id.*) Following issuance of the complaint, Special Agent Monarko sought a warrant to go back and search Unit 315 for other items related to the identity theft charges. (*Id.*) She was advised by the detectives who executed the First State Warrant that they only searched the unit for items related to the burglary investigation and that items related to identity theft might still have been located in the storage unit. (*Id.*)

The warrant was issued by Magistrate Judge David R. Strawbridge on August 4, 2011 (the "Federal Warrant"). (Def.'s Br. Ex. E.) Attached to the Federal Warrant is a five and a half page Affidavit outlining information derived from the investigation to support probable cause to search Unit 315 for items related to the identity theft charges. (Affidavit, Def.'s Br. Ex. E.) The Affidavit states that during the course of the search on April 7, 2011, the detectives seized over 600 print-outs of credit reports, which included various individuals' names, addresses, Social Security numbers and telephone numbers. (*Id.*) The Affidavit also states that the notebooks seized pursuant to execution of the First State Warrant contained handwritten notes regarding purchases made utilizing personal identifying information of various individuals. (*Id.*)

Special Agent Monarko executed the Federal Warrant on August 5, 2011. (Dec. 6 Hr'g Tr. 87.) When arriving at Unit 315, the storage unit appeared to "be in decent condition" and did not appear to have been "looked through" or "completely tossed." (*Id.*) Items seized during execution of the Federal Search Warrant included four checkbooks in individuals' names other

---

[9] The state case is still pending against Defendant in the Philadelphia County Court of Common Pleas. The state case involves only the burglary charges.

than Defendant, an Ace Cash Express debit card, several tax documents belonging to other

people, a notebook and a separate piece of notebook paper containing personal identifying

information, Defendant's high school diploma, receipts for a different storage unit rented to

Defendant, and an identification card not belonging to Defendant. (*Id.* at 88-90.)

We found that Detectives Sloan, Hartman, Acerenza and Geliebter and Special Agent

Monarko were all credible witnesses.

## III.    CONCLUSIONS OF LAW

Defendant moves to suppress the three state search warrants, the Federal Warrant, and all

physical evidence seized pursuant to those warrants.  Defendant argues that the First State

Warrant was a facially invalid general warrant and that any evidence seized pursuant to it must

be suppressed.  Defendant further argues that all of the warrants issued and searches conducted

subsequent to the search of Unit 315 were tainted because the probable cause supporting those

warrants was based on evidence seized pursuant to the First State Warrant.  The Government

responds that the searches were supported by probable cause and were conducted by the

detectives in good faith reliance on four validly issued search warrants that were neither general

nor overly broad.  The Government also argues that all of the items seized fall within three

categories of admissibility:  1) recovered pursuant to valid search warrant; 2) seized in plain

view; or 3) obtained pursuant to a search incident to a lawful arrest.

### A.    The First State Warrant Meets the Particularity Requirement of the Fourth Amendment

The Fourth Amendment guarantees the "right of the people to be secure in their persons,

houses, papers, and effects, against unreasonable searches and seizures."  U.S. Cons. amend. IV.

It further provides that "no Warrants shall issue, but upon probable cause, supported by Oath or

affirmation, and particularly describing the place to be searched and the persons or things to be seized." *Id.* The particularity requirement effectively prohibits the issuance of "general warrants." *Andresen v. Maryland*, 427 U.S. 463, 478 (1976). "In order to prevent the police from undertaking a general, exploratory rummaging through a person's belongings, a warrant must give a particular description of the things to be seized." *United States v. Johnson*, 690 F.2d 60, 64 (3d Cir. 1982) (internal quotation marks omitted). The particularity requirement assures that "nothing is left to the discretion of the officer executing the warrant." *United States v. Tracey*, 597 F.3d 140, 146 (3d Cir. 2010) (quoting *Marron v. United States*, 275 U.S. 192, 196 (1927)).

Defendant argues that the First State Warrant violated the particularity requirement because it contained a catch-all phrase at the end of the warrant's list of specific items to be seized: "[Two] 42" Plasma Tv's, Playstation 3 game system, x-box game system, Nintendo games system, 1 Scepter 37" flat screen TV, *and any other items of evidentiary value*." (Def's Br. Ex. B) (emphasis added). Defendant argues that by including the catch-all phrase "any other items of evidentiary value" at the end of the list of items to be seized, the warrant turned into an invalid general warrant.

The Supreme Court has addressed this very issue. In *Andresen*, the Court held that a general tail at the end of a list of enumerated items to be seized does not create an impermissible general warrant. 427 U.S. at 481. The warrant in *Andresen* contained a long list of items related to a fraudulent real estate scheme, followed by the phrase, "together with other fruits, instrumentalities and evidence of crimes at this [time] unknown." *Id.* at 479. The Court observed that the catch-all phrase at the tail end of the list was "not a separate sentence" but

15

rather appeared at the end of a list of specific items.  *Id.*  The Court concluded that reference to "crime" in the catch-all phrase was meant to be interpreted in the context of the preceding specified list, meaning that it limited the search to other evidence of the real estate scheme described in the warrant.  *Id.*  The Court held that the warrant was not unconstitutionally general.  *Id.*

The Third Circuit has similarly found that a catch-all phrase following a list of specific items to be seized does not render a warrant impermissibly broad.  In *United States v. American Investors of Pittsburgh, Inc.*, the Court analyzed a warrant authorizing the search of categories of "specifically delineated records and seizure of other documents and items considered [] fruits, instrumentalities and/or evidence of criminal activity."  879 F.2d 1087, 1093 (3d Cir. 1989).  The Court held that "because the items to be seized were described with sufficient particularity, the general tail, which is not read in isolation, does not render the warrant invalid."  *Id.* at 1106.

These cases establish the principle that general phrases in a warrant must be read in the context of the entire warrant and not in isolation.  *Andresen*, 427 U.S. at 473; *see also Johnson*, 690 F.2d at 64 (noting that warrants must be read as a whole).  Applying this principle to the instant case compels the conclusion that the First State Warrant was not a general warrant.  The catch-all phrase, "any other item of evidentiary value," is not a sentence separate from the list of items to be searched for and seized.  It is read in reference to the preceding list, which enumerates items believed to be stolen from other storage units at the Safeguard Self Storage facility, including television sets and gaming systems.  The catch-all phrase must also be construed in reference to the type of crimes alleged in the warrant.  Specifically, where the warrant requests information on the type of conduct Defendant allegedly committed, the First

16

State Warrant lists "burglary, theft, [receiving stolen property]."  When reading the list of items to be searched for in conjunction with the alleged statutory violations, it is apparent that the phrase, "any other items of evidentiary value," refers to evidence specifically relating to the crimes of burglary, theft and receiving stolen property.  Contrary to Defendant's contention, the catch-all phrase does not permit the search and seizure of evidence that may relate to any crime.

This construction is further supported by the detectives' understanding of the phrase "any other items of evidentiary value."  Detective Sloan understood the phrase to "refer to any other items in reference to the burglaries" such as "tv cords, remotes, [and] any paperwork for [the] items."  (Dec. 6 Hr'g Tr. 10.)  Detective Hartman understood the phrase to mean that the detectives were permitted to search for "any physical evidence pertinent to the investigation of the burglaries that [they] were conducting."  (*Id.* at 54.)  Detective Acerenza understood the phrase to mean that the detectives could search for "items that pertain to the burglaries" including "[televisions], PlayStation III game system, Xbox game system, Nintendo game system, and items that may also go along with those items such as remote controls, plugs to the game systems, the controllers and games."  (*Id.* at 65-66.)

Even though the catch-all phrase, "any items of evidentiary value," is broadly drafted, when read in conjunction with the rest of the warrant, it is not overly broad.  In contrast to a general warrant, an overly broad warrant "describe[s] in both specific and inclusive generic terms what is to be seized, but authorizes the seizure of items as to which there is no probable cause."  *United States v. Ninety-Two Thousand Four Hundred Twenty-Two Dollars & Fifty-Seven Cents*, 307 F.3d 137, 149 (3d Cir. 2002) (internal quotation marks omitted).  While an invalid general warrant requires suppression of all of the evidence seized, an overly broad warrant can be "cured

by redaction, [meaning] striking from the warrant those severable phrases and clauses that are invalid for lack of probable cause or generality and preserving those severable phrases and clauses that satisfy the Fourth Amendment." *Id.*

Redaction of the catch-all phrase in this case, however, is not required. When the phrase is read in reference to the crimes alleged and the preceding list of specific items to be seized, probable cause justified the search and seizure of the items from Defendant's storage unit. The fact that many of the items discovered and seized related to different criminal charges than the ones referenced in the warrant does not defeat probable cause. "Courts have never held that a search is overbroad merely because it results in additional criminal charges." *United States v. Williams*, 592 F.3d 511, 520-21 (4th Cir. 2010) (noting that simply because information found on a DVD may "have indicated crimes other than those described in the warrant does not preclude its seizure.") (internal quotation marks omitted); *United States v. Christine*, 687 F.2d 749, 760 (3d Cir. 1982) (finding no Fourth Amendment violation "merely because [a search] cannot be performed with surgical precision" or "merely because [a seized item] happens to contain other information not covered by the terms of the warrant").

In *United States v. Santarelli*, the Eleventh Circuit addressed the issue of overbreadth when evidence seized pursuant to a warrant supported additional crimes not contemplated by the warrant. 778 F.2d 609 (11th Cir. 1985). In *Santarelli*, the warrant under attack authorized the search and seizure of evidence that related to an alleged loan-sharking operation. *Id.* at 613. The warrant contained a list of specific items to be seized followed by a catch-all phrase that authorized the search of "all property constituting evidence of the crimes" related to extortionate credit transactions. *Id.* at 613-614. The FBI seized documents pursuant to the catch-all phrase

that implicated the defendant in the crime of tax evasion, a crime not named in the warrant. *Id.* at 614. When the defendant was subsequently convicted of tax evasion, he challenged the district court's refusal to suppress the documents, arguing that the catch-all phrase rendered the warrant overly broad, and that the search exceeded the scope of the warrant since documents that were seized related to crimes not described in the warrant. *Id.* at 614-615. The Eleventh Circuit affirmed the district court's denial of the defendant's motion to suppress, concluding that the warrant was sufficiently particular and that the search conducted did not exceed the authority granted in the warrant. *Id.* at 616.

In this case, simply because the detectives seized evidence that not only supported the burglary and theft crimes contemplated by the warrant, but also the additional crime of identity theft does not render the warrant overly broad. *Id.*; *see also Andresen*, 427 U.S. at 482-83 (rejecting defendant's argument that documents seized pursuant to the catch-all phrase and used to prove another crime that is not the subject of the warrant was unlawful). Moreover, the search conducted on Unit 315 did not exceed the scope of the First State Warrant since the detectives were searching only for the electronic items named in the warrant and any additional items of evidentiary value that typically accompany those electronic items.

The particularity requirement is met here. There is no allegation that the detectives engaged in a general rummaging through Unit 315 outside the scope of the warrant's authorization. The specific description of the items to be searched for and seized, together with the warrant's identification of the crimes under investigation, provided sufficient specificity and limitations on how the search should have been conducted. The detectives testified that they limited their search to locating items related to the crimes under investigation, including the

19

stolen electronics equipment specifically identified in the warrant, as well as other items that may accompany such equipment, such as chords, remote controls, gaming system games and paperwork. The detectives were permitted to search in boxes and crates, folders and accordion files, and in any containers in which these items could reasonably fit. *See United States v. Pritchard*, 745 F.2d 1112, 1122 (7th Cir. 1984) ("Certainly a search for small electronic devices justifies entry into containers in which they would fit and might reasonably be found.")

Accordingly, we conclude that the First State Warrant is neither a general warrant nor an overly broad warrant.

### B. Good Faith Reliance on the First State Warrant

Even if one were to conclude that the First State Warrant lacked sufficient particularity as a result of the catch-all phrase, we would nevertheless deny Defendant's Motion to Suppress based upon the good faith exception to the exclusionary rule.

The purpose of the exclusionary rule is to "deter police conduct that violates constitutional rights of citizens." *United States v. Zimmerman*, 277 F.3d 426, 436 (3d Cir. 2002) (citing *United States v. Leon*, 468 U.S. 897, 919 (1984)). This purpose is not advanced, however, and suppression should not result where an officer, acting in objective good faith, obtains and executes a deficient or invalid warrant "because in such cases only marginal deterrent purposes will be served which cannot justify the substantial costs of exclusion." *Id.* at 436 (internal quotation marks omitted). The good faith exception to the exclusionary rule applies when an officer "executes a search in objectively reasonable reliance on a warrant's authority." *United States v. Hodge*, 246 F.3d 301, 307 (3d Cir. 2001) (quoting *United States v. Williams*, 3 F.3d 69, 74 (3d Cir. 1993)). The exception operates to exclude evidence seized pursuant to an invalid

20

warrant when a "reasonably well trained officer would have known that the search was illegal despite the magistrate [judge's] authorization." *Leon*, 468 U.S. at 922 n.23.

Even though the "mere existence of a warrant typically suffices to prove that an officer conducted a search in good faith," the Third Circuit has identified the following four narrow situations when application of the good faith exception is not appropriate:

(1) The magistrate judge relies on a deliberately or recklessly false affidavit in issuing the warrant;

(2) The magistrate judge abandoned his or her judicial role and failed to perform his or her neutral and detached function;

(3) When the affidavit on which the warrant was based is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; or

(4) The warrant is facially deficient in that it fails to particularize the place to be searched or the things to be seized.

*Hodge*, 246 F.3d at 308 (citing *Williams*, F.3d at 74 n.4).

Defendant argues that the good faith exception does not apply because the warrant was so deficient on its face and imposed no limits on the scope of the detectives' search. We disagree. We have concluded that the First State Warrant met the particularity requirement because it sufficiently described the items to be seized. The warrant was neither a general warrant nor overly broad. Moreover, Defendant's counsel admits that there was probable cause to issue the First State Warrant. (*See* Dec. 6 Hr'g Tr. 91 (stating that "[t]here is no dispute, Judge, that there was probable cause to issue the first search warrant").) Therefore, Defendant cannot reasonably argue that the warrant was so lacking in indicia of probable cause or that the magistrate judge abandoned his judicial role in issuing the warrant. All three detectives who searched Unit 315 pursuant to the First State Warrant were highly trained, each having previously executed hundreds of search warrants. It was objectively reasonable for the detectives to rely on the

warrant, not only in light of the magistrate judge's determination that the warrant was supported by probable cause, but also in light of the precedent authorizing similarly drafted warrants. Accordingly, suppression of the evidence is not justified under these circumstances.

### C.       Evidence Seized Pursuant to the First State Warrant

The Government contends that the evidence seized during execution of the First State Warrant falls into two categories:  evidence that was lawfully seized within the scope of a valid warrant or evidence that was seized in plain view while executing the search.  In addition, the Government contends that the items seized during the search incident to Defendant's arrest are properly admissible.

#### 1.       Evidence Seized Under Scope of the First State Warrant

The seized items falling within the scope of the First State Warrant include some of the notebooks and the identification cards in Defendant's name.[10]  The detectives testified that the notebooks were opened during the course of the search to determine whether they contained notes pertaining to the crimes being investigated.  In particular, the detectives had probable cause to believe that Defendant was stealing items from other storage units and selling these items to other individuals.[11]  The detectives were looking for information concerning the whereabouts of these items and information about the burglary victims and potential buyers of the stolen items.

--------------------------------

[10] The detectives do not recall which notebooks were found in the storage unit and which were retrieved from the Defendant.  We agree with the Government that this is immaterial because both sets of notebooks are admissible.

[11] The continuation of probable cause stated that when the Safeguard Self Storage management visited Defendant's unit a second time, they noticed that one of the items that they saw during their first visit and which they believed to have been stolen was no longer present in his storage unit.  Therefore, there was reason to believe that items were being sold or transferred.

(*See* Dec. 6 Hr'g Tr. 20 (Sloan stating: "I'm looking to see if he has notes of where the items might have been or who they might have been sold to or where he might be storing them at if he has another locker").)   Information found in the notebooks could have assisted the detectives in locating Defendant, as well as locating the stolen items.  Indeed, based on a notation in one of the notebooks, the detectives were able to locate one of the buyers of the stolen equipment and return the equipment to its rightful owner.  Therefore, the search of the notebooks was reasonable and within the scope of the warrant since the notebooks could and in fact did serve as items of evidentiary value relating to the burglary investigation.

The identification cards belonging to Defendant also fall within the scope of the warrant because they could have assisted the detectives in locating the Defendant and are therefore items of evidentiary value.  The identification cards are also properly admissible under the plain view doctrine.  *See infra* ¶ III.C.2.[12]  The incriminating nature of multiple identification cards for one person listing different addresses was immediately apparent to the detectives.  Detective Sloan testified that he found it "odd" for Defendant to have so many identification cards with different addresses.  (Dec. 6 Hr'g Tr. 21-22.)  The identification cards were observed in plain view upon the detectives' lawful entry into Unit 315 to execute the First State Warrant.  (*Id.* at 22.)  We are satisfied that even if the identification cards were seized outside the scope of the warrant, based on the totality of the circumstances, including the incriminating nature of other evidence seized at Unit 315, probable cause existed to seize the identification cards under the plain view doctrine.

---

[12]  The doctrine instructs that evidence seized in plain view is admissible if the police are lawfully present at the place where the evidence is viewed, the police have lawful access to the evidence, and the incriminating nature of the evidence is immediately apparent.  *United States v. Menon*, 24 F.3d 550, 559 (3d Cir. 1994).

## 2.      *Evidence Seized in Plain View*

The Government argues that many of items seized at Defendant's storage unit are admissible under the plain view doctrine. These items include the credit reports located in both the shoe boxes and in the milk crate, documents found inside the folders and the priority mail envelope, credit cards found inside the Burberry box, blank checks and a piece of paper containing personal identifying information for individuals other than Defendant.

The plain view doctrine is a well-recognized exception to the Fourth Amendment's warrant requirement. Under the plain view doctrine, police may seize contraband and other incriminating evidence discovered in plain view. *Horton v. California*, 496 U.S. 128, 141 (1990). In order to be to be admissible, evidence seized without a warrant must satisfy three requirements. First, the police must lawfully have arrived at the place from which the evidence could plainly be viewed. *Menon*, 24 F.3d at 559 (3d Cir. 1994). Second, the incriminating character of the evidence in plain view must be "immediately apparent" to the officer. *Horton*, 496 U.S. at 136. Third, the officer must have a "lawful right of access to the object itself." *Id.* at 137. The doctrine "cannot be used to expand the scope of a legal search." *Menon*, 24 F.3d at 560. Rather, "there must be scrupulous adherence to the requirement that the search be limited to the time and place necessary to find the items listed on the warrant." *Id.*

There is no dispute that in executing the First State Warrant, the detectives were lawfully present at Defendant's storage facility. The first element is therefore met. With respect to the requirement that the officer have a "lawful right of access to the object," *Horton*, 496 U.S. at 136, courts have held that this element is met so long as "the agent's search fits within the literal terms of the warrant and is a reasonable means of obtaining the objects described in the warrant."

*Menon*, 24 F.3d at 560. Here, the discovery of evidence in plain view occurred while the detectives searched within the literal terms of the warrant. The detectives were permitted to open the shoe boxes to search for the items listed in the warrant that were capable of fitting inside, such as chords, remote controls, games and gaming systems. Thus, the detectives had a lawful right of access to the credit reports contained inside of the shoe boxes. The same is true with respect to the search of the folders, the priority mail envelope and the Burberry box, all of which could fit a game CD. The warrant gave the detectives a lawful right to access the evidence found in these containers.

As for the "immediately apparent" requirement, the appropriate standard to apply is probable cause. *Texas v. Brown*, 460 U.S. 730, 741-42 (1983) (explaining that the "seizure of property in plain view . . . is presumptively reasonable, assuming there is probable cause to associate the property with criminal activity"). This element does not require actual knowledge. *Id.* at 742. Rather, the probable cause standard "merely requires that the facts available to the officer would warrant a [person] of reasonable caution in the belief that certain items may be contraband or stolen property or useful as evidence of a crime; it does not demand any showing that such a belief be correct or more likely true than false." *Id.* Here, there was probable cause to believe that the evidence discovered in plain view was associated with the crime of identity theft. The detectives observed multiple stacks of credit reports in the names of other people, blank checks and notes containing other individuals' Social Security numbers, addresses and other personal identifying information. The detectives testified that they knew when first observing these items in plain view that Defendant's possession of them was improper. The incriminating nature of the items seized in plain view was readily apparent. *See Menon*, 24 F.3d at 560-63

(evidence of fraud was readily apparent from cursory review of documents).

### 3. *Computer Hard Drives and Flash Drives*

The basis upon which the three hard drives, the thumb drive and the flash drive adapters were seized is unclear. Nevertheless, we are satisfied that at the very least, these items are admissible under the doctrine of inevitable discovery. This doctrine instructs that evidence seized in an unconstitutional search should not be suppressed "if it is shown that the evidence would ultimately have been seized legally if the constitutional violation had not occurred." *United States v. Stefonek*, 179 F.3d 1030, 1035 (7th Cir. 1999). The Government must establish by a preponderance of the evidence that the police would have ultimately or inevitably discovered the evidence. *United States v. Stabile*, 633 F.3d 219, 245 (3d Cir. 2011).

The Government argues that upon observation of the credit reports in plain view, or upon examination of the notebooks, the detectives could have obtained a warrant to search the entire storage locker for evidence of identity theft. We agree. There was an overwhelming volume of evidence lawfully discovered that provided more than sufficient probable cause to believe that the crime of identity theft had been committed. Indeed, the issuance of the Second State Warrant was based on such a showing of probable cause. The Government has met its burden with respect to these electronics items.

### 4. *Items Recovered from Defendant During Arrest*

When Defendant was arrested, certain items were seized incident to his arrest. These items included spiral-bound notebooks, a laptop computer, an iPod, a cell phone and a key to the storage unit. The notebooks, laptop computer and iPod were located inside a shoulder bag worn by Defendant at the time of his arrest. The Government contends that all of these items were

lawfully seized incident to Defendant's arrest.

It is well settled that a search incident to a lawful arrest is a traditional exception to the warrant requirement of the Fourth Amendment. *United States v. Robinson*, 424 U.S. 218, 226 (1973). Under this exception, an arresting officer may search a defendant's person including the area within the defendant's immediate control. The phrase "within immediate control" is construed to mean the "area from within which [the defendant] might gain possession of . . . destructible evidence." *Chimel v. California*, 395 U.S. 752, 763 (1969); *United States v. Myers*, 308 F.3d 251, 267 (3d Cir. 2002). Here, the seizure of items from Defendant incident to his arrest was lawful. The detectives were entitled to search Defendant for weapons. The detectives were also permitted to search Defendant in order to prevent destruction of evidence. The items were recovered either from Defendant's pockets or from the shoulder bag which he was carrying. The evidence was lawfully seized.

### C. The Subsequent Warrants and Searches Were Not Tainted

Having determined that the seizure of all of the items pursuant to execution of the First State Warrant and the arrest of the Defendant were constitutional, the subsequent search warrants, which were based upon this evidence, were also lawful. The First State Warrant was not a general warrant, nor was it overly broad. It is not disputed that the First State Warrant was supported by probable cause. The subsequent state warrants and the Federal Warrant were similarly supported by probable cause as a result of the evidence lawfully seized from the search conducted pursuant to the First State Warrant.

## IV. CONCLUSION

For the foregoing reasons, Defendant's Motion to Suppress Search Warrants is denied.

An appropriate Order follows.

**BY THE COURT:**


**/s/** *R. Barclay Surrick*
**U.S. District Judge**